No. 22-2493

# In the United States Court of Appeals for the Third Circuit

———————

SHERICE SARGENT, INDIVIDUALLY, AS NEXT FRIEND OF HER MINOR CHILD, AND ON BEHALF OF THOSE SIMILARLY SITUATED; MICHELE SHERIDAN, INDIVIDUALLY, AS NEXT FRIEND OF HER MINOR CHILD, AND ON BEHALF OF THOSE SIMILARLY SITUATED; AND JOSHUA MEYER, INDIVIDUALLY, AS NEXT FRIEND OF HIS MINOR CHILD, AND ON BEHALF OF THOSE SIMILARLY SITUATED,

*Plaintiffs-Appellants*,

v.

THE SCHOOL DISTRICT OF PHILADELPHIA, ET AL.,

*Defendants-Appellees*,

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania, Philadelphia Division
Case No. 2:22-cv-01509-CFK

———————

## APPELLANTS' BRIEF

———————

WALTER S. ZIMOLONG
Zimolong LLC
Post Office Box 552
Villanova, Pennsylvania 19085
(215) 665-0842
wally@zimolonglaw.com

GENE P. HAMILTON
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

The appellants respectfully request oral argument, as the issues in this case are sufficiently important and complex to warrant argument time.

# TABLE OF CONTENTS

Statement regarding oral argument .......................................................... ii

Table of contents ...................................................................................... iii

Table of authorities ..................................................................................iv

Statement of jurisdiction ........................................................................... 2

Statement of the issues ............................................................................. 2

Statement of related cases and proceedings ............................................3

Statement of the case.................................................................................3

    I.    Sherice Sargent ................................................................12

    II.    Michelle Sheridan ...........................................................14

    III.    Joshua Meyer ..................................................................15

    IV.    The district-court proceedings........................................18

Standard of review ..................................................................................21

Summary of argument .............................................................................21

Argument .................................................................................................24

    I.    The district court committed an error of law in concluding that the school district's admissions policies were subject to rational-basis review rather than strict scrutiny .................................24

    II.    The district court committed an error of law in requiring the plaintiffs to produce evidence of a racially discriminatory impact...... 35

    III.    The plaintiffs will suffer irreparable injury absent preliminary relief.........................................................................38

    IV.    The public interest supports a preliminary injunction ......................39

    V.    The Harms That May Result From A Preliminary Injunction Do Not Outweigh The Need For Immediate Relief...........................39

Conclusion ...............................................................................................42

Certificate of bar membership ................................................................44

Certificate of compliance ........................................................................45

Certificate of service................................................................................46

# TABLE OF AUTHORITIES

## Cases

*Boston Parent Coalition for Academic Excellence Corp. v. School Committee of City of Boston*, 996 F.3d 37 (1st Cir. 2021) ........................................................ 36

*Califano* v. *Yamasaki*, 442 U. S. 682 (1979) .................................................... 40

*Christa McAuliffe Intermediate School PTO, Inc. v. de Blasio*,
364 F. Supp. 3d 253 (S.D.N.Y. 2019) ............................................................ 36

*Council of Alternative Political Parties v. Hooks*,
121 F.3d 876 (3d Cir. 1997) ........................................................................... 39

*Davis v. Romney,* 490 F.2d 1360 (3d Cir. 1974) ................................................ 41

*Dep't of Homeland Security v. New York*, 140 S. Ct. 599 (2020) ..................... 41

*Doe ex rel. Doe v. Lower Merion School District*,
665 F.3d 524 (3d Cir. 2011) ..................................................................... 30, 33

*Fisher v. University of Texas at Austin*, 570 U.S. 297 (2013) ........................... 25

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ........................................ 8, 25, 26, 27

*Guinn v. United States*, 238 U.S. 347 (1915) .................................................... 37

*Hunt v. Cromartie*, 526 U.S. 541 (1999) ........................................................... 33

*Miller v. Johnson*, 515 U.S. 900 (1995) ...................................................... 23, 36

*Parents Involved in Community Schools v. Seattle School District No. 1*,
551 U.S. 701 (2007) ........................................................................................ 25

*Pennsylvania v. President United States*, 930 F.3d 543 (3d Cir. 2019) ........... 41

*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979) ... 30

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) ................................ 22

*Shaw v. Hunt*, 517 U.S. 899 (1996) ................................................................... 26

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ......................................................... 41

*Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017) ................. 40

*United States v. National Treasury Employees Union,* 513 U.S. 454 (1995) .... 40

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977)..................................................................................36

*Vuitton v. White*, 945 F.2d 569 (3d Cir. 1991)............................................21

**Statutes**

28 U.S.C. § 1292(a)(1) .................................................................................. 2

28 U.S.C. § 1331 ............................................................................................ 2

42 U.S.C. § 2000d .................................................................................. 19, 26

**Constitutional Provisions**

Pa. Const. art. I, § 26 ..................................................................................19

Pa. Const. art. I, § 29 ...................................................................... 19, 26, 27

**Other Authorities**

John Harrison, *Section 706 of the Administrative Procedure Act Does Not
    Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J.
    On Reg. Bull. 37 (2020) ..........................................................................41

Charles Alan Wright et al., Federal Practice and Procedure (3d ed.
    2007) .......................................................................................................42

v

In 2021, in the name of "antiracism" and "equity," the School District of Philadelphia announced that it was changing the selection criteria for its elite criteria-based schools. Before 2021, admission to these select schools was based on academic merit, with the principal of each school having the final say on admission. But the school district was unhappy with the racial distribution that this system generated, even though its elite criteria-based schools were already diverse with no school having a white majority. The school district believed that some select schools, in particular a science and technology school, had an underrepresentation of non-black students ("too black") and that white and Asian students were "overrepresented" in other schools (in other words "not black or Hispanic enough.") So it overhauled the admissions process in a conscious and intentional effort to rebalance the racial makeup of the student body. It did so by moving away from merit-based admission and toward a gerrymandered lottery system—with the conscious aim of achieving a racial makeup of the student body that more closely resembles the racial demographics of the city's overall population. While all students participate in the lottery, students who reside in certain "underrepresented zip codes" are given preference for admission over students who do not reside in those zip codes.

The plaintiffs are parents of students who have applied to the school district's criteria-based schools and have been excluded from their preferred school on account of the school district's racially motivated admissions policies. They seek a preliminary injunction to restrain the school district from

using this racially motivated system to exclude their children from admission to their preferred criteria-based school.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because the case arises under federal law. This Court's appellate jurisdiction rests on 28 U.S.C. § 1292(a)(1) because the plaintiffs have appealed an order denying a motion for preliminary injunction. Appx3. The district court issued this order on August 8, 2022, Appx3, and the plaintiffs filed their notice of appeal on August 11, 2022, Appx1–2.

## STATEMENT OF THE ISSUES

1. Did the district court commit an error of law in concluding that the school district's admissions policies were subject to rational-basis review rather than strict scrutiny?

2. Did the district court commit an error of law in requiring the plaintiffs to produce evidence of a racially discriminatory impact, in addition to evidence of racially discriminatory motive?

3. Will the plaintiffs and their minor children suffer irreparable injury absent preliminary relief?

4. Does the public interest support a preliminary injunction?

5. Will the harms that may result from a preliminary injunction outweigh the need for immediate relief?

**STATEMENT OF RELATED CASES AND PROCEEDINGS**

Counsel is unaware of any other case or proceeding that is in any way related, completed, pending, or about to be presented before this court or any other court or agency, state or federal.

**STATEMENT OF THE CASE**

The School District of Philadelphia maintains a system of public high schools. The city's public high schools fall into one of three categories: (1) neighborhood high schools, also known as "catchment" schools; (2) citywide admissions high schools; and (3) special-admission or criteria-based high schools, also known as "magnet" schools. Appx26 (¶ 11); Appx215–216; Appx224–225.

Neighborhood or catchment high schools are open to students living within certain defined geographical neighborhood boundaries. Appx26 (¶ 12); Appx215; Appx224–225. Citywide admissions high schools accept students from across the city. These schools do not use merit-based admission criteria, and admission to a citywide school is based on the submission of an application and the outcome of a computerized lottery. Admission to these schools is subject to space availability. Appx26 (¶ 13); Appx215–216; Appx225.

Special-admission or criteria-based high schools (also called magnet schools), like citywide admissions schools, do not have an attendance boundary and students must apply for admission. Appx26 (¶ 14). Admission to these criteria-based or "magnet" schools had traditionally been determined

by "competitive entrance requirements related to attendance, punctuality, behavior, grades, and standardized test scores,"[1] until the school district decided to change the selection process in 2021. The school district has described these criteria-based high schools as those "which offer a rigorous, enriched curriculum that may concentrate on a particular discipline or area of study, such as mathematics, natural sciences, engineering, humanities; social sciences, or fine and performing arts." Appx26 (¶ 15); Appx27 (¶ 16); Appx225.

In the spring of 2021, the school district's Board of Education approved a policy document entitled "Board of Education Goals & Guardrails." Appx28 (¶¶ 20–21); Appx232–235. The Goals & Guardrails document includes a section entitled "Addressing Racist Practices," which announces that "our students' potential will not be limited by practices that perpetuate systemic racism and hinder student achievement." Appx235. The Goals & Guardrails document states:

> Among 8th grade students who are qualified to attend Special Admission High schools, the percentage who are Black/African American or Hispanic/Latinx will grow from 33.8% in August 2020 to at least 52.0% (making progress towards being proportional to population as a whole) by August 2026.

Appx235. The Goals & Guardrails document also states:

> The percentage of suspensions received by Black/African American students will decrease from 72.6% in August 2020 to

---

1.    Appx27 (¶ 16); Appx225; Appx226.

no more than 48.3% (proportional to population as a whole) by August 2026.

Appx235.

Later in 2021, after approving this "Goals & Guardrails" document, the school district decided to change the standards for admission to its criteria-based schools, starting with students applying for admission during the 2021–2022 school year, who would be seeking admission for the 2022–2023 school year. Appx28–29 (¶¶ 18–19, ¶¶ 22–25); Appx127. The school district changed the admissions process for its criteria-based schools by: (a) eliminating the Pennsylvania System of School Assessment (PSSA) test as a criterion for admission; (b) eliminating letters of recommendation and interviews as criteria for admission; and (c) requiring applicants to sit for a 90-minute essay exam, which is administered and scored by a computer program called MI Write. Appx28 (¶¶ 18–19, ¶¶ 22–23); Appx127. Only students whose computerized essay score equals or exceeds 22 out of 30 would be eligible for admission to Masterman and Central, and only students with essay scores at 17 or above would be eligible for admission to Carver, Parkway, and Palumbo. Appx28 (¶ 23).[2]

The school district further changed its admission practices by instructing criteria-based schools to admit students by lottery if they satisfied the minimum grade cut-offs (As and Bs) and minimum essay-score cut-offs (17 or 22), rather than allowing principals to select the best qualified students from among the applicant pool, as had been done previously. Appx29 (¶ 24); Appx127.

---

2. The school district later decided to lower to cut-off score for admission to Masterman and Carver from 21.5. Appx610–611 (¶ 6).

Finally, the school district changed its admission practices by requiring students residing in six specified zip codes—19121, 19132, 19133, 19134, 19135, and 19140—to receive preferences in the lotteries for admission to Masterman, Central, Carver, Parkway, and Palumbo. Appx29 (¶ 25); Appx127 ("Zip code preference will be applied at select criteria-based schools for students who meet the minimum qualifications"). Based on 2020 census data, the racial makeup of these six preferred zip codes is as follows:[3]

|  | Black | Hispanic | White | Asian |
|---|---|---|---|---|
| 19121 | 72.2% | 6.5% | 15.4% | 3.5% |
| 19132 | 91.9% | 3.2% | 2.5% | 1.15% |
| 19133 | 36.7% | 57.7% | 3.6% | 3.5% |
| 19134 | 13.4% | 51.3% | 30.3% | 1.6% |
| 19135 | 20.9% | 24.2% | 44.7% | 5.7% |
| 19140 | 50.1% | 42.2% | 4.3% | 1.7% |
| overall student body in school district | 47% | 23% | 15% | 10% |

Five of six the preferred zips codes are located in North Philadelphia, and the remaining zip code (19135) is located in the northeast.[4] No zip codes from South Philadelphia, Southwest Philadelphia, or West Philadelphia appear on the preferred zip-code list, even though many pockets of these communities

---

3.   The term "white" in the chart refers to non-Hispanic whites, and the term "black" refers to non-Hispanic blacks. The data were obtained from data.census.gov. *See* Mitchell Decl. ¶ 4, ECF No. 32-16.

4.   Maps of Philadelphia that highlight the territory of these preferred zip codes can be found at ECF Nos. 32-7 through 32-12.

are impoverished and overwhelmingly populated by minorities.[5] The school district has openly admitted that the changes to the admissions process were made "in alignment with our commitment toward antiracism and equity, as outlined in the Board of Education's Goals and Guardrails." Appx127.

Each of the five magnet schools affected by the new lottery-with-zip-code-preference system already had a majority-minority enrollment before the school district's changes to the selection process, and each of them had a critical mass of black, Hispanic, and Asian students. The racial enrollment for the 2021–2022 school year at Masterman, Central, Carver, Parkway, and Palumbo was as follows:

| Ethnicity | Asian | Black/African American | Hispanic/Latino | Multi Racial | White |
|---|---|---|---|---|---|
| Academy at Palumbo | 34% | 37% | 10% | 3% | 15% |
| Carver High School of Engineering and Science | 13% | 63% | 9% | 6% | 8% |
| Central | 39% | 18% | 8% | 5% | 30% |
| Masterman | 27% | 15% | 6% | 10% | 43% |
| Parkway Center City Middle College | 7% | 70% | 17% | 4% | 2% |
| Philadelphia School District | 10% | 47% | 23% | 5% | 15% |

Table: DOMINIQUE DeMOE / Staff Artist • Source: School District of Philadelphia

---

5.  The school district claims that it selected these six preferred zip codes because they held "the lowest percentage of students attending four criteria-based high schools over the previous four years." Br. in Opp. to Mot. for Prelim. Inj., ECF No. 37, at 3–4.

Appx29–30 (¶ 28). As can seen from the chart, at least two of the school district's elite magnet schools (Carver and Parkway) have a black enrollment that far exceeds the black population of the school district as a whole. And while black and Hispanic student enrollment at Masterman and Central falls below the percentages that appear in the overall student body of the school district, it still constitutes a "critical mass" under *Grutter v. Bollinger*, 539 U.S. 306, 329–36 (2003).

On December 15, 2021, the City Council of Philadelphia, Committee on Education held a hearing on the school district's plans to change the admissions process for its criteria-based schools. Appx252–515. Parents, members of the city council, and members of the community spoke overwhelmingly against the changes and blasted the school district for the lack of transparency in the way the new selection criteria were imposed. Councilmember David Oh was nonplussed at the zip-code preferences:

> [T]here were no zip codes in West Philadelphia, no zip codes in Southwest Philadelphia, no zip codes in South Philadelphia, no zip codes in most parts of Philadelphia that represent underserved communities. So it was unclear to me at that time what the basis of all of this was.

Appx259–260. Councilmember Oh also criticized the school district for announcing these changes immediately before the application process began:

> [T]his was announced the day before a seven-week window open for applications to these criteria-based admissions schools. And people were reeling from the fact that an entirely new process had been put in without their knowledge, without their op-

portunity to discuss or to have experts weigh in on it and that it
was already implemented.

Appx260. Councilwoman Helen Gym was equally critical of the school dis-

trict for springing these changes shortly before the application process

opened and for keeping parents in the dark about it:

> [I]n terms of process, announcing a brand new high school se-
> lections process on the day that high school selection effectively
> with almost no information going to parents is irresponsible. It
> created chaos and uncertainty, fear and suspicion. That is the
> wrong approach towards any school system, towards its stu-
> dents, towards its parents and towards its educators and towards
> our City.

Appx265. She also criticized the idea of using computer-scored essays to de-

termine eligibility for admission. Appx267 ("It is shocking to me that a com-

puter would read and review essays for applications to a school. . . .

[A]lgorithms, removing human judgment are no way a form of equity.").

Councilmember Jamie Gauthier criticized the zip-code preferences as overly

blunt and insufficiently calibrated. Appx270–271.

State Representative Donna Bullock, who chairs the Pennsylvania Legis-

lative Black Caucus, appeared at the hearing and sharply criticized the pro-

cess by which the school district implemented these new admission policies:

> The School District's development and implementation of the
> new admissions process is fraught with miscommunication, lack
> of transparency, conflicting information and mishaps, such as
> the total system failure during the administration of the online
> writing assessment at one school. These things continue to call
> on and to question the effectiveness of the policy and more spe-
> cifically, the ability of the School District to execute it.

Appx280–281. Professor Joshua Wilson of the University of Delaware testi-
fied that the school district was misusing the computer-scored essay because
MI Write was never intended to be used without a teacher or human rater
evaluating the student's writing. Appx288–289. And parent after parent tes-
tified about how the school district's new admissions policies harmed their
children and eroded the meritocracy that had previously determined en-
trance into the city's magnet schools. Appx379–388 (Sherice Sargent);
Appx389–393 (Tanya Folk); Appx393–398 (Wallette Carter); Appx398–403
(Miriam Hill); Appx403–408 (Eric Santoro).

Two of the defendants, Sabriya Jubilee and Karyn Lynch, testified at the
hearing on behalf of the school district and defended the proposed changes.
Dr. Jubilee, who serves as Chief of Equity for the School District of Philadel-
phia, testified as follows:

> On June 15, 2020 in the wake of the murders of Breonna Taylor,
> Ahmaud Aubery, George Floyd and countless others, as a Dis-
> trict we released or statement on anti-racism. In this statement,
> we committed to becoming an anti-racist equitable organization
> by uprooting policies, deconstructing processes and eradicating
> practices that create systems of privilege and power for one
> group over the other.
>
> The upending of privilege highlighted here is not simply in ref-
> erence to a configuration of numbers or an assessment of differ-
> ences in skin color or features, but rather speaks to the destruc-
> tion of a system and the dismantling institutionalization of
> norms. It doesn't just ask for us to set aside seats as a way to ap-
> pease a few, but rather challenges us to explore questions of
> why, who and for what.

> Through the school selection process, we have the opportunity
> to redesign a process that from inception to current practice has
> only truly benefited a small group of stakeholders, many of
> whom do not reflect the majority demographic of our School
> District or City. But this presentation, I am not speaking solely
> about visibility, but more about the impact of opportunity, ac-
> cess and power.

Appx335–336. Karyn Lynch, who serves as the Chief of Student Support

Services for the School District of Philadelphia, testified that the changes to

the school-selection process were made in response to the murder of George

Floyd and inspired by the school district's "Goals & Guardrails" document:

> In addition to the removal of the PSSA as a criteria for the
> school selection process last year—this year, not last year, our
> District was also impacted by the growing national attention to
> racism, mainly the murder of George Floyd among others. As a
> result as an organization, we committed to examining all of our
> processes, procedures and practices to ensure equity and (inau-
> dible). . . .
>
> For more than a year, the School District obtained feedback
> about the school selection process and listened to individuals
> and representatives of groups to inform the improvements to
> the school selection process. Several public meetings held by the
> Board of Education as its members considered the Board's goals
> and guardrails.
>
> One indicator for the guardrails is ending racist practices as I've
> shared in our policies and procedures.

Appx344–346. Ms. Lynch also admitted that "racial dynamics" (as well as

other factors) played a role in the school district's decision to switch from

merits-based admissions to the lottery system with zip-code preferences.

Appx372 ("[A] good deal of the discussion has been about access and equity

to these schools, so it's not just based on racial dynamics."). And Ms. Lynch warned that these changes were just "the beginning with more to come with regard to access and equity." Appx358.

Only one parent, Stephanie King, testified in support of the proposed changes. Appx482–485. She claimed that "much of the objection to this policy is privileged and racist," and she denounced the "privileged parents who are simply [upset] that they rigged their game towards the wrong test." Appx483–484. Ms. King continued:

> Statistics do not lie. Philadelphia's magnet schools are not representative of Philadelphia's demographics or zip codes and have become overwhelmingly a concentration of privilege. This policy levels the playing field while still requiring excellence. The people protesting it are of self-interest, should be ashamed of themselves.
>
> If these Councilmembers complaining and parents protesting just don't want to send your kids with poor people even when they're qualified, then just say that instead of this fake concern, and take the word fair out of your mouth.

Appx484.

## I.    Sherice Sargent

Plaintiff Sherice Sargent is the mother of a black female student who recently completed eighth grade at George Washington Carver High School of Engineering and Science (Carver), a science, engineering, and technical school for grades 7 through 12. Appx604 (¶ 3); Appx604 (¶ 5). When Ms. Sargent's daughter was admitted into Carver, a school district official stated that if she maintained an A/B average she would be able to continue her edu-

cation at Carver's high school. Appx604 (¶ 6). Ms. Sargent's daughter maintained an A/B average and meets all of the criteria for admission into Carver for the ninth grade. Appx605 (¶ 8).

Ms. Sargent's daughter, however, is not being allowed to continue her studies at Carver on account of the school district's decision to replace the school's merit-based admissions program with a lottery system. Appx605 (¶ 9). Ms. Sargent's daughter was waitlisted at Carver (receiving waitlist number 187) and placed in Walter B. Saul High School, an agricultural school that specializes in teaching students how to become farmers. Appx605 (¶ 11). The district eventually cancelled the waitlist for Carver so Ms. Sargent's daughter never gained admission or placement. Appx605 (¶ 12). Neither Ms. Sargent nor her daughter lives in any of the six zip codes that receive preferential treatment in the lottery. Appx605 (¶ 10).

Ms. Sargent's daughter has always been a highly academically motivated student. Appx605 (¶ 13). She has been immersed in STEM (science, technology, engineering, and mathematics), and she chose Carver because of the computer-science track that they start in middle school. Appx605–606 (¶ 14). Her older brother also attended Carver. *See id.* She started volunteering at the school four years of ago because of her brother's enrollment and became interested in computer science and robotics. *See id.* She eventually left her K–8 school and enrolled at Carver because wants to follow in her brother's footsteps. *See id.*

Ms. Sargent's daughter intends to enroll in a technology-focused college. Appx606 (¶ 15). Her goal is to gain acceptance to Drexel University's computer-science program, and Drexel has a partnership with Carver. *See id.* Saul does not have any computer science or robotics classes or programs. Appx606 (¶ 16). Saul also has a lower graduation and college-admissions rate than Carver. Appx606 (¶ 17). The catchment school in Ms. Sargent's neighborhood was closed five years ago due to poor performance, so Ms. Sargent has no choice but to send her daughter to schools outside their neighborhood. Appx606 (¶ 18). The school district's new admissions policies have caused a significant decline in the number of black students enrolled at Carver. Appx606 (¶ 20).

## II.  MICHELLE SHERIDAN

Plaintiff Michele Sheridan is the mother of a student who recently completed eighth grade at Christopher Columbus Charter School. Appx608 (¶¶ 3–4). Ms. Sheridan's son is non-white (bi-racial). Appx608 (¶ 5). Ms. Sheridan's son applied for admission to the Academy at Palumbo, a criteria-based school. Appx608 (¶ 6). Ms. Sheridan and her son live mere feet from the front door of the Academy at Palumbo. Appx608 (¶ 7). Ms. Sheridan's son is an A and B student and meets all the requirements for admission into the school; he also scored 22.5 on the school district's admission essay. Appx608 (¶¶ 8–9). But Ms. Sheridan's son was denied admission to the Academy of Palumbo and was wait-listed at number 530. Appx609 (¶ 10).

Ms. Sheridan's family does not reside in any of the "underrepresented zip codes" that receive admissions preferences. Appx609 (¶ 11).

Ms. Sheridan and her son are suffering irreparable harm over the school district's new admissions policies. Since Ms. Sheridan's son learned that cannot attend the Academy of Palumbo, his behavior has regressed. Appx609 (¶ 12). He has had verbal outbursts over his inability to attend the Academy of Palumbo. *See id*. He plans to attend college someday and he has been devastated that he won't get the opportunity to take AP classes at Palumbo. *See id*. He is interested in architecture and wants to study that in college, and he feels as though his future has been derailed by the school district's refusal to allow him to attend the school that he is academically qualified to attend. *See id*. He has asked many times why he bothered working so hard when the school district court won't allow his academic achievements to control his school assignment. *See id*. Ms. Sheridan's son also wants to play football and looked forward to competing on the Academy of Palumbo's football team, and he hoped that his football achievements would boost his college applications and earn him a football scholarship. *See id*. He has completely lost that opportunity on account of the school district's racially motivated admissions policies. *See id*.

## III. JOSHUA MEYER

Plaintiff Joshua Meyer is the father of a student who recently completed eighth grade at the Julia R. Masterman Laboratory and Demonstration School (Masterman). Appx610 (¶¶ 3–4). Mr. Meyer's son is white. Appx610

(¶ 3). Mr. Meyer's son wants to continue his high-school studies at Masterman, which consistently ranks as the top high school not only in Philadelphia but in the entire state of Pennsylvania. He also would have been excited to attend Central High School, another school with a history of high achievement and a broad range of accelerated and exciting offerings. Appx610 (¶ 5). Mr. Meyer's son is a stellar student, having received only one quarter grade less than an A (one 5th grade quarter of a B in music). All of his final grades were A's. He also scored over a 25 out of 30 on the school district's computer-scored writing sample, which exceeds the minimum required score of 22 for admission to Masterman and Central. Appx610–611 (¶ 6).

Mr. Meyer's son would have very likely been admitted to Masterman, as well as Central High School, under the merit-based admission system that was used before the school district switched to the lottery system. Under the previous regime, the top 50% (approximately) of the eighth-grade class at Masterman would be admitted to the high school, and the strong grades that Mr. Meyer's son has earned place him well within the top 50% of his eighth-grade class. In addition, virtually all Masterman eighth graders would be admitted to Central High School under the previous merit-based admission system. Appx611 (¶ 7). But as a result of the school district's decision to replace its merit-based admissions system, Mr. Meyer's son did not get admitted to either Masterman or Central. Appx611 (¶ 8).

Mr. Meyer has decided to enroll his son in a private school for the fall of 2022. Appx611 (¶ 9). But either Masterman or Central would have been a

better high school for Mr. Meyer's son under the previous admissions criteria, where students were accepted on the basis of merit and the institutions served as elite magnet schools for the city's most ambitious and hardest-working students. Appx611 (¶ 10). Yet the new lottery-based admission system has so diluted the academic quality of Masterman and Central that Mr. Meyer may not even want his son to attend those schools over the private school where he is enrolled for the upcoming school year, even if his son had won admission under the new lottery-based system. Appx611 (¶ 11).

Mr. Meyer's son is being grievously harmed by the school district's decision to change admissions standards in its effort to achieve racial balancing at the city's criteria-based high schools. Appx611–612 (¶ 12). He is hardworking and ambitious, and is interested in challenging himself in high school. His goal is to take intellectually rigorous courses, including a substantial number of AP courses, in order to prepare himself for the most academically challenging college career that is available to him. Appx611 (¶ 12). Masterman presented an ideal opportunity for him to be surrounded by other students from a variety of backgrounds and coming from all over the city who shared this mindset. Appx611–612 (¶ 12). The top-notch education in addition to the tremendous diversity of the students was an incredible combination that helped to teach these students both graded and ungraded lessons that were vital to their growing up to be effective members of the community. Appx612 (¶ 12). Unfortunately, the new selection process has diminished the school's ability provide this unique opportunity. Appx612 (¶ 12).

## IV.  The District-Court Proceedings

Ms. Sargent and Ms. Sheridan sued the defendants on April 19, 2022,[6] and moved to certify a plaintiff class on May 10, 2022.[7] The proposed class consisted of:

> all students and parents of students who: (1) applied for admission to a Philadelphia criteria-based school but were denied admission because of the school district's racially discriminatory admissions standards; or (2) will apply for admission to a criteria-based school in the future but face an increased risk of being denied admission because of the school district's decision to abandon merits-based admission standards and pursue racial balancing in the student body of its criteria-based schools. The class includes everyone who has ever fallen within this definition.

Mot. for Class Certification, ECF No. 22, at 1. Two days later, however, the district court summarily denied the class-certification motion "without prejudice" and asked to have the motion "resubmitted for consideration after the close of pleadings and a ruling is made on the demand for a preliminary injunction." Order, ECF No. 23.

On June 3, 2022, the plaintiffs filed an amended class-action complaint that added Mr. Meyer as a plaintiff[8] and moved for a preliminary injunction.[9] The plaintiffs alleged that the School District of Philadelphia and its officials

---

6.   Original Complaint, ECF No. 1.
7.   Mot. for Class Certification, ECF No. 22.
8.   Appx613–630 (amended complaint).
9.   *See* Mot. for Prelim. Inj., ECF No. 32.

were violating Title VI,[10] the Equal Protection Clause, and article I, sections 26 and 29 of the Pennsylvania Constitution[11] by using racially discriminatory standards for selecting and admitting students to the city's criteria-based schools. Appx626–628. And they asked the district court to preliminarily enjoin the defendants from: (1) implementing the changes that the School District of Philadelphia adopted in 2021 governing the admission of students to the city's criteria-based or magnet schools; (2) using race to determine the admission of students to the city's criteria-based or magnet schools; and (3) changing the admissions policies to the city's criteria-based or magnet schools if those changes are made for the purpose of altering the racial makeup of those schools. *See* Proposed Order, ECF No. 33. The parties stipulated to the relevant facts. Appx25–34 (stipulation); Appx36–581 (exhibits to stipulation).

After a hearing, the district court denied the plaintiffs' motion for preliminary injunction after concluding that they that failed to establish a "reasonable probability of eventual success in the litigation." Appx10; *see also*

---

10. *See* 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.").

11. *See* Pa. Const. art. I, § 26 ("Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right."); Pa. Const. art. I, § 29 ("Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the race or ethnicity of the individual.").

Appx3 (order); Appx4–24 (opinion). The district court found that the plain-tiffs' had failed to demonstrate a "reasonable probability of eventual success on the merits" for three reasons. First, the district court held that the plain-tiff had failed to show a "reasonable probability of proving that the changes to the admissions policy for the 2021–2022 admissions process to the School District's criteria-based schools were motivated by a racially discriminatory purpose." Appx13; *see also* Appx13–20. In the district court's view, Indicator 4.1 of the "Goals & Guardrails" document merely expressed a desire to boost the percentage of black and Hispanic students who are *qualified* to attend the city's criteria-based high schools, rather than a desire to affect in any way the ultimate racial make-up of the city's criteria based schools:

> Among 8th grade students who are *qualified* to attend Special Admission High schools ... , the percentage who are Black/African American or Hispanic/Latinx will grow from 33.8% in August 2020 to at least 52.0% (making progress toward being proportional to population as a whole) by August 2026.

Appx15 (quoting Goals & Guardrails document at Appx235) (emphasis added by the court). The district court explained:

> By its plain language, Indicator 4.1 does not address, at all, in-creasing the number of Black/African American or Hispan-ic/Latinx students who are *admitted to* or who *attend* the School District's criteria-based schools, rather Indicator 4.1 addresses increasing the number of Black/African American or Hispan-ic/Latinx students who are *qualified* to attend such schools.

Appx15–16 (emphasis in original). The district court therefore concluded that rational-basis review rather than strict scrutiny should apply.

Second, the district court held that the plaintiffs had "failed to show that the changes to the admissions policy fail rational basis review,"[12] given that the new admissions policies (in the district court's view) were subject only to rational-basis scrutiny. Appx20–21.

Finally, the district court held that the plaintiffs needed to show not only a racially discriminatory purpose, but *also* a racially discriminatory impact— and that the plaintiffs had failed to demonstrate that the changes to the school district's admissions policies would alter the racial composition of the student body at Palumbo, Carver, Masterman, or Central. Appx22.

The plaintiffs filed a timely notice of appeal. Appx1.

## STANDARD OF REVIEW

A district court's decision to grant or deny a preliminary injunction is reviewed for an abuse of discretion, error of law, or clear mistake of fact. *See Vuitton v. White*, 945 F.2d 569, 574 (3d Cir. 1991) ("We review a district court's ruling on a preliminary injunction only to determine if there has been (1) an abuse of discretion, (2) an error of law, or (3) a clear mistake of fact. *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 198 (3d Cir. 1990).").

## SUMMARY OF ARGUMENT

The test for a preliminary injunction is well established: An applicant must show "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted." *Reilly v.*

---

12.   Appx20.

*City of Harrisburg*, 858 F.3d 173, 176–77 (3d Cir. 2017) (quoting *Delaware River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)). A court should also consider: "(3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id.* A court "should balance those four factors so long as the party seeking the injunction meets the threshold on the first two." *Id.* The plaintiffs easily satisfy each of these four factors, and the balance of the factors cuts strongly in favor of preliminary injunctive relief.

The plaintiffs are likely to succeed on the merits because the school district *admits* in its Goals & Guardrails document that it changed admissions policies with the conscious aim of altering the racial makeup of the city's elite criteria-based schools. Appx235. The district court tried to pass off this smoking-gun evidence by claiming that it evinced only a desire to increase the percentage of black and Hispanic students who are *qualified* to attend the city's criteria-based schools—rather than the percentages of blacks and Hispanics who *ultimately attend* those schools. Appx15–16. But that distinction accomplishes nothing when the school district is admitting students *by lottery* among those deemed "qualified," which ensures that the racial makeup of the chosen students will resemble the racial makeup of the "qualified" students. More importantly, the school district itself defines and determines the "qualifications" that make one eligible for admission to the criteria-based schools. Appx16. And the school district *redefined* those minimum qualifications in response to the Goals & Guardrails document, and in a conscious ef-

fort to change the racial composition of the admitted students. Appx28 (¶ 23). The district court committed a clear mistake of fact in refusing to credit the Goals & Guardrails document (and the remaining evidence) as evidence that the change in admissions policies was racially motivated.

The district court also went off track in requiring the plaintiffs to prove a racially discriminatory impact in addition to a racially discriminatory purpose behind the change in admissions policies. Appx22. A facially neutral law or policy that was enacted for a racially discriminatory purpose will *always* be subject to strict scrutiny—regardless of the actual effects of the law. *See, e.g.*, *Miller v. Johnson*, 515 U.S. 900, 913 (1995) ("[S]tatutes are subject to strict scrutiny under the Equal Protection Clause not just when they contain express racial classifications, *but also when, though race neutral on their face, they are motivated by a racial purpose or object*." (emphasis added)). And in all events, the plaintiffs *did* show a "reasonable probability" that the school district's move away from a merits-based admission process to a lottery with zip code preferences will achieve the desired outcome of reducing the numbers of "overrepresented" racial groups, such as Asian-Americans and whites at Masterman and Central, and blacks at Carver. Appx606 (unrebutted declaration from Sherice Sargent claiming that the new admissions policies "caused a significant decline in the number of black students enrolled at Carver.").

Finally, although the district court did not consider the remaining three factors of the preliminary-injunction inquiry, the plaintiffs comfortably satisfy each of them. The plaintiffs produced unrebutted evidence that their chil-

dren will suffer irreparable harm absent a preliminary injunction, and an injunction will by definition serve the public interest if the Court concludes that the new admissions policies were racially motivated and therefore unlawful. Finally, there little if any harm that will befall the school district or others from a preliminary injunction, as any relief will necessarily be limited to the three plaintiffs given the absence of a certified class.

## ARGUMENT

### I. THE DISTRICT COURT COMMITTED AN ERROR OF LAW IN CONCLUDING THAT THE SCHOOL DISTRICT'S ADMISSIONS POLICIES WERE SUBJECT TO RATIONAL-BASIS REVIEW RATHER THAN STRICT SCRUTINY

The district court held that the plaintiffs had failed to establish a reasonable probability of eventual success on the merits because it determined that the school district's admissions policies were subject to rational-basis review rather than strict scrutiny. Appx13–20. And the district court reached this conclusion because it held that the plaintiffs had failed to show that the changes to the school district's admissions policies were motivated by a racially discriminatory purpose. Appx13–20. The district court committed legal error in concluding that rational-basis review rather than strict scrutiny applies, and its holding that the plaintiffs failed to demonstrate a racially discriminatory purpose is a clear mistake of fact.

It is indisputable that the school district changed its admissions practices because it wanted to alter the racial makeup of its magnet schools—and to ensure that the racial composition of those schools more closely resembled

the demographics of the city as a whole. The Goals & Guardrails document makes this as clear as be:

> Among 8th grade students who are qualified to attend Special Admission High schools, the percentage who are Black/African American or Hispanic/Latinx will grow from 33.8% in August 2020 to at least 52.0% (making progress towards being proportional to population as a whole) by August 2026.

Appx235. The school district is not even attempting to hide its racial motivations, and it proudly proclaims that it "will" increase black and Hispanic enrollment to its announced quota of "at least 52.0%." And then it announces that this will be only the *first* step in a five-year march toward racially proportional representation in the city's magnet schools. In light of the Supreme Court's repeated admonitions that "racial balancing . . . is patently unconstitutional,"[13] one can only marvel at the temerity of the school district in producing a document of this sort. Karyn Lynch also testified before the city council that the Goals & Guardrails document (as well as the murder of George Floyd) inspired the change in school district's admissions policies,[14] and that "racial dynamics" (as well as other factors) played a role in the school district's decision to abandon merits-based admissions a switch to a lottery system with zip-code preferences.[15] And the school district's High

---

13. *Grutter v. Bollinger*, 539 U.S. 306 (2003); *see also Fisher v. University of Texas at Austin*, 570 U.S. 297, 311 (2013); *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 730 (2007) (plurality opinion of Roberts, C.J.).

14. *See* Ex. 6 at 93–95.

15. *See* Ex. 6 at 121.

School Directory for 2022 admits that the changes to the admissions process was made "in alignment with our commitment toward antiracism and equity, as outlined in the Board of Education's Goals and Guardrails." Appx127.

So the school district has all but confessed that its new admissions practices were adopted for the purpose of achieving racial balancing in the city's magnet schools—which runs headlong into the many statutory and constitutional prohibitions on racial discrimination in public education. *See* 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be . . . subjected to discrimination under any program or activity receiving Federal financial assistance."); *Shaw v. Hunt*, 517 U.S. 899 (1996) ("[T]he Fourteenth Amendment['s] . . . central purpose was to eliminate racial discrimination emanating from official sources in the States."); Pa. Const. art. I, § 29 ("Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the race or ethnicity of the individual.").

The only remaining question is whether the school district can hide behind *Grutter* and invoke the allowance that the Supreme Court has recognized for public-university affirmative-action programs. *See Grutter*, 539 U.S. at 326–42. It cannot do for many reasons. First, there is already a "critical mass" of black and Hispanic students at the city's elite magnet schools, including Masterman and Central. *See supra* at 6. Second, the city's zip-code preferences are not "narrowly tailored" to the goal of student-body racial diversity. *See Grutter*, 539 U.S. at 326. Third, the school district is engaged in

"outright racial balancing" because its "Goals and Guardrails" document purports to establish a quota and declares that its ultimate goal is to achieve racially proportional representation at the city's magnet schools. *See Grutter*, 539 U.S. at 330 ("[O]utright racial balancing . . . is patently unconstitutional"); *id.* at 334 ("[A] race-conscious admission program cannot use a quota system"). Fourth, race-conscious admissions practices are allowed only when a school "engages in a highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute to a diverse educational environment," *Grutter*, 539 U.S. at 337. That is assuredly not happening under the school district's revised admissions policies. Fifth, the school district's use of racial balancing is not time-limited. *See id.* at 342 ("[R]ace-conscious admissions policies must be limited in time"; *id.* at 351 (Thomas, J., concurring in part and dissenting in part) ("I agree with the Court's holding that racial discrimination in higher education admissions will be illegal in 25 years."). Finally, *Grutter*'s affirmative-action allowance is inapplicable to article I, § 29 of the Pennsylvania Constitution, which prohibits discrimination on account of race or ethnicity without exception. See Pa. Const. art. I, § 29 ("Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the race or ethnicity of the individual.").

So there is a reasonable probability—indeed, a near-certainty—that the plaintiffs will prevail on their claim that the school district's admissions poli-

cies were racially motivated in violation of the Equal Protection Clause, Title VI, and article I, § 29 of the Pennsylvania Constitution.

The district court held otherwise, but none of its reasons withstand scrutiny. The district court correctly observed that that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause," and this same showing is needed to establish a violation of Title VI and article I, section 29 of the Pennsylvania Constitution. Appx11 (quoting *Doe ex rel. Doe v. Lower Merion School District*, 665 F.3d 524, 543 (3d Cir. 2011)). But the district court held that the plaintiffs' evidence of racially discriminatory intent fell short, because it interpreted the numerical goals in Indicator 4.1 of the Board of Education's Goals & Guardrails document as referring only to the racial composition of students who are "qualified" to attend the city's criteria-based schools, rather than the students who are admitted or who will ultimately attend those schools. Appx15–16. The Court explained:

> Indicator 4.1 does not address, at all, increasing the number of Black/African American or Hispanic/Latinx students who are *admitted to* or who *attend* the School District's criteria-based schools, rather Indicator 4.1 addresses increasing the number of Black/African American or Hispanic/Latinx students who are *qualified* to attend such schools.

Appx15–16. But this does nothing to refute the plaintiffs' claim that the school district changed its admissions policies with the intent of altering the racial composition of its criteria-based schools. First, the school district is admitting students by lottery among those who meet the minimum qualifica-

tions—which ensures that the racial makeup of the chosen students will resemble the racial makeup of the "qualified" students. It also means that any "goal" or quota regarding the racial composition of the "qualified" students will by definition serve as a goal for the racial makeup of the overall student body at the city's criteria-based schools.

Second, as the district court acknowledged in its opinion, the school district gets to define and determine the minimum "qualifications" for admissions to the criteria-based schools. Appx16. And it is undisputed that the school district redefined those minimum qualifications in response to the Goals & Guardrails document. Appx28 (¶ 23) ("The 2021–22 admissions process required applicants to Palumbo, Carver, Central, and Masterman to complete a 'district administered writing sample,' . . . which was administered and scored by a computer program called MI Write. Students whose computerized essay score equaled or exceeded 22 out of 30 were qualified for admission to Central or Masterman, and only students with essay scores at 17 or above were qualified for admission to Palumbo or Carver.").

The district court faulted the plaintiffs for failing to produce evidence that these new qualification standards "would benefit any one race of students over another." Appx16. But evidence of that sort is unnecessary to prove racially discriminatory *intent* when the Goals & Guardrails document specifically announces a racial-composition "goal" for the students who will be deemed "qualified" to attend the city's special-admission high schools—and then the school district alters its qualification standards in response to

that publicly announced goal. The Board of Education has *admitted* that its "goal" is to increase percentage of black or Hispanic students who fall within the category of those "qualified" to attend its criteria-based schools:

> Among 8th grade students who are qualified to attend Special Admission High schools, the percentage who are Black/African American or Hispanic/Latinx will grow from 33.8% in August 2020 to at least 52.0% (making progress toward being proportional to population as a whole) by August 2026.

Appx235. And when the school district redefines the meaning of "qualified" in response to this publicly announced "goal," nothing further is needed to show that racial balancing was at least one motivating factor behind the school district's decision to change the "qualification" standards. *See Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("'Discriminatory purpose,' . . . implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."). The discriminatory-purpose inquiry is unconcerned with the ultimate effects of the school district's admissions policies; it turns only on the school district's motivations for adopting the policy that it did. And the Goals & Guardrails document leaves no doubt that the school district was motivated (at least in part) by a desire to change the racial composition of the students deemed "qualified" to attend the city's criteria-based schools—as well as the racial composition of the students selected to attend. *See Doe ex rel. Doe v. Lower Merion School District*, 665 F.3d 524, 551 n.42 (3d Cir. 2011) ("The racially discrimi-

natory purpose need not be the sole or primary factor motivating the decision to adopt the challenged action.").

The district court also downplayed the public statements of school-district officials Sabriya Jubilee and Karyn Lynch, who testified in defense of the new admissions policies before the city council. Dr. Jubilee, who serves as Chief of Equity for the School District of Philadelphia, testified as follows:

> On June 15, 2020 in the wake of the murders of Breonna Taylor, Ahmaud Aubery, George Floyd and countless others, as a District we released or statement on anti-racism. In this statement, we committed to becoming an anti-racist equitable organization by uprooting policies, deconstructing processes and eradicating practices that create systems of privilege and power for one group over the other.
>
> The upending of privilege highlighted here is not simply in reference to a configuration of numbers or an assessment of differences in skin color or features, but rather speaks to the destruction of a system and the dismantling institutionalization of norms. It doesn't just ask for us to set aside seats as a way to appease a few, but rather challenges us to explore questions of why, who and for what.
>
> Through the school selection process, we have the opportunity to redesign a process that from inception to current practice has only truly benefited a small group of stakeholders, many of whom do not reflect the majority demographic of our School District or City. But this presentation, I am not speaking solely about visibility, but more about the impact of opportunity, access and power.

Appx335–336. Karyn Lynch, who serves as the Chief of Student Support Services for the School District of Philadelphia, testified that the changes to

the school-selection process were made in response to the murder of George Floyd and inspired by the school district's "Goals & Guardrails" document:

> In addition to the removal of the PSSA as a criteria for the school selection process last year — this year, not last year, our District was also impacted by the growing national attention to racism, mainly the murder of George Floyd among others. As a result as an organization, we committed to examining all of our processes, procedures and practices to ensure equity and (inaudible). . . .

> For more than a year, the School District obtained feedback about the school selection process and listened to individuals and representatives of groups to inform the improvements to the school selection process. Several public meetings held by the Board of Education as its members considered the Board's goals and guardrails.

> One indicator for the guardrails is ending racist practices as I've shared in our policies and procedures.

Appx344–346. Ms. Lynch also admitted that "racial dynamics" (as well as other factors) played a role in the school district's decision to switch from merits-based admissions to the lottery system with zip-code preferences. Appx372 ("[A] good deal of the discussion has been about access and equity to these schools, so it's not just based on racial dynamics."). And Ms. Lynch warned that these changes were just "the beginning with more to come with regard to access and equity." Appx358.

The district court, however, held that these statements merely demonstrated that the school district and its officials were *aware* of the racial impact of their new admissions policies; they did not, in the Court's view, evince a

racial *motivation* for the change. Appx18 ("[T]he Court finds that none of the statements made by Dr. Jubilee or Ms. Lynch demonstrate that the changes to the admissions policy were instituted for a racially *discriminatory* purpose." (emphasis in original)); *id.* ("The Third Circuit has made clear that '[t]he consideration or awareness of race while developing or selecting a policy…is not in and of itself a racial classification.' Further, the Third Circuit has specifically provided that '[d]esigning a policy "with racial factors in mind" does not constitute a racial classification if the policy is facially neutral and is administered in a race-neutral fashion.'" (citations omitted).

The district court was right to observe that mere knowledge or awareness of the racial effects of a chosen policy does not, without more, show racially discriminatory intent. *See, e.g.*, *Lower Merion*, 665 F.3d at 548 ("[T]he mere awareness or consideration of race should not be mistaken for racially discriminatory intent or for proof of an equal protection violation"); *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) ("[A] jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact."). But the statements from Dr. Jubilee and Ms. Lynch go beyond expressing mere knowledge or awareness that the change in admission policies will alter the racial composition of the city's criteria-based schools. Each of their statements made clear that this was the *desired* result of the new admissions policies—and that this was (at least in part) a motivating factor for these changes. Consider once again the statements from Dr. Jubilee:

> [A]s a District . . . we committed to becoming an anti-racist eq-
> uitable organization by uprooting policies, deconstructing pro-
> cesses and eradicating practices that create systems of privilege
> and power for one group over the other.

Appx335; *see also* Appx336 (complaining that "current practice has only truly

benefited a small group of stakeholders, many of whom do not reflect the ma-

jority demographic of our School District or City."). And consider the state-

ments from Ms. Lynch admitting that changed its admissions policies in re-

sponse to the murder of George Floyd and for the purpose of "ensur[ing]

equity":

> [O]ur District was also impacted by the growing national atten-
> tion to racism, mainly the murder of George Floyd among oth-
> ers. As a result as an organization, we committed to examining
> all of our processes, procedures and practices to ensure equity
> . . . .

Appx344–345; see also Appx372 ("[A] good deal of the discussion has been

about access and equity to these schools, *so it's not just based on racial dynam-

ics*." (emphasis added)).

Finally, the district court was too quick to dismiss the zip-code prefer-

ences as evidence of racial motivation. Appx18–20. The district court ob-

served (correctly) that the chosen zip codes were neither the "blackest" nor

the "whitest" zip codes, Appx19, but it overlooked the fact that the Asian-

American population in each of the six preferred zip codes is significantly be-

low the 7% level of Asian-Americans in the overall student body of the Phila-

delphia public schools—and *far* below the percentage of Asian-American

students that currently populate Masterman, Central, Carver, and Palumbo.

*Compare* Appx29–30 (¶ 28) (showing that Asian-Americans make up 36% of the student body at Palumbo, 14% at Carver, 38% at Central, and 26% at Masterman); *with* Appx251 (showing that the percentage of Asian-American residents in the six preferred zip codes is 3.5%, 1.1%, 3.5%, 1.6%, 5.7%, and 1.7%). The school district claims that those six zip codes were chosen because they had "the lowest percentage of students attending four criteria-based high schools over the previous four years." Defs.' Br. in Opp. to Mot. for Prelim. Inj., ECF No. 37, at 3–4; *see also* Appx21 & n.7. But even if this is true, the fact remains that the school district selected these six zip codes after the Board of Education had announced in its Goals & Guardrails document that it would increase the percentage of qualified black and Hispanic students from 33.8% in August 2020 to "at least 52.0%" by August 2026—a goal that can be achieved only by *reducing* the percentage of Asian-American and white students in the pool of "qualified" applicants. All of this evidence, considered together, shows that the school district was motivated (at least in part) by a desire to alter the racial composition of its criteria-based schools.

## II. THE DISTRICT COURT COMMITTED AN ERROR OF LAW IN REQUIRING THE PLAINTIFFS TO PRODUCE EVIDENCE OF A RACIALLY DISCRIMINATORY IMPACT

The Court also denied relief because it claimed that the plaintiffs failed to show that the change in admissions policies "resulted in a racially discriminatory impact." Appx22. But a facially neutral law or policy that was enacted for a racially discriminatory purpose will *always* be subject to strict scruti-

ny—regardless of the actual effects of the law. *See, e.g.*, *Miller v. Johnson*, 515 U.S. 900, 913 (1995) ("[S]tatutes are subject to strict scrutiny under the Equal Protection Clause not just when they contain express racial classifications, *but also when, though race neutral on their face, they are motivated by a racial purpose or object*." (emphasis added)); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–66 (1977) ("When there is a proof that a discriminatory purpose has been a motivating factor in the decision, [rational-basis review] is no longer justified."); *see also Boston Parent Coalition for Academic Excellence Corp. v. School Committee of City of Boston*, 996 F.3d 37, 45 (1st Cir. 2021) ("Absent a showing of discriminatory purpose, we review an equal protection challenge to race-neutral selection criteria for a rational basis only."); *Christa McAuliffe Intermediate School PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 276–77 (S.D.N.Y. 2019) ("If a court concludes that the government used a racial classification or was motivated by racial discrimination, then the court must review the government action under strict scrutiny. Absent either conditions, the government action is subject to rational basis review." (citation omitted)). Racially discriminatory purpose alone is sufficient to move a case out of rational-basis review and into strict scrutiny.

Imagine a school or a college that adopts an admissions policy with the avowed intention of reducing the number of black students—perhaps something analogous to the "Grandfather Clause," which would grant automatic admission to students whose parents or grandparents attended the school. *Cf.*

*Guinn v. United States*, 238 U.S. 347 (1915). A policy of that sort is unconstitutional and must be enjoined regardless of whether it achieves its desired aim in reducing black student enrollment—and it is easy to imagine scenarios in which a racially motivated policy of that sort would not result in a racially disparate impact. Perhaps all the "legacy" admittees would have won admission anyway without the unlawful preferences, or perhaps the black students that the school or college were hoping to cull wound up getting admitted despite the intentional roadblocks that were placed in their path. Yet none of that would matter because the discriminatory *intent* dooms the policy regardless of whether it ultimately affects the racial composition of the student body.

In all events, the plaintiffs *did* show a "reasonable probability" that the school district's new admissions policies will have the effect of altering the racial makeup of the city's criteria schools, as they were designed to do—even though the parties did not yet have complete data at the time showing the racial composition of the incoming students for the 2022–23 school year. A plaintiff does not need to prove its case on a motion for preliminary injunction, and it is not only "probable" but nearly certain that the school district's drastic change in admissions policies, and its move away from a merits-based admission process to a lottery with zip code preferences, will achieve the desired outcome of reducing the numbers of "overrepresented" racial groups, such as Asian-Americans and whites at Masterman and Central, and blacks at Carver. Sherice Sargent's unrebutted declaration states that the new ad-

missions policies "caused a significant decline in the number of black students enrolled at Carver." Appx606. The school district did not contest this declaration, and it did not contend that its new admission policies will leave the racial makeup of the city's criteria schools unchanged, and it presented no reason for imagining that such an outcome could occur.

## III. The Plaintiffs Will Suffer Irreparable Injury Absent Preliminary Relief

The plaintiffs and their children will suffer grievous and irreparable harm if the school district is not enjoined from implementing these changes to its admissions policies. Sherice Sargent's daughter, who wanted to continue her studies at Carver in the hopes of winning acceptance to Drexel University's computer-science program, has been relegated to an agricultural school where she will learn to become a farmer. Appx605–606 (¶¶ 14–17). Michelle Sheridan's son had his dreams of attending the Academy of Palumbo dashed and now regards the hard work he put in during his middle-school years as useless, and he is being deprived of the opportunity to take AP classes at Palumbo and compete on the school's football team. Appx609 (¶ 12). Joshua Meyer's son, who earned straight A's at Masterman, is being forced to leave the school where he has attended and wished to continue, a school that consistently ranks as the top high school not only in Philadelphia but in the entire state of Pennsylvania. Appx610 (¶ 5). These students—and many other students of all races and backgrounds—are having their educations and their fu-

tures ruined by the school district's misguided and ill-conceived pursuit of racial balancing.

## IV. The Public Interest Supports A Preliminary Injunction

The public interest also supports a preliminary injunction. There is no conceivable public interest that can support the school district's decision to abandon merit-based admissions in favor of a system in which students who meet the minimum academic criteria are admitted by lottery, with arbitrary and unexplained preferences conferred on the residents of six selected zip codes. And the school district has never attempted to justify this change in admissions policies apart from making vapid appeals to "equity" — which is nothing more than an unconstitutional desire to attain racial balancing in the city's elite magnet schools. And if the Court agrees with us that the city's new admissions practices were influenced by unconstitutional racial motivations, then the public interest will by definition require a preliminary injunction. *See Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 884 (3d Cir. 1997) ("[T]he public interest clearly favors the protection of constitutional rights.").

## V. The Harms That May Result From A Preliminary Injunction Do Not Outweigh The Need For Immediate Relief

There is little if any harm that will befall the school district from a preliminary injunction, because the district court refused to certify the plaintiffs' class and will not consider the class-certification motion until after this

Court rules on the appeal. *See* Order, ECF No. 23 (May 12, 2022) (denying without prejudice the plaintiffs' motion for class certification and instructing the motion to be "resubmitted for consideration after the close of pleadings and a ruling is made on the demand for a preliminary injunction."); Order, ECF No. 58 (October 19, 2022) (denying without prejudice the plaintiffs' renewed motion for class certification and announcing that "all further proceedings and discovery shall be STAYED until a determination is made by the Third Circuit. After the appeal is resolved, this Court will issue an Order scheduling a Rule 16, during which the timing of filing of all motions and discovery will be scheduled.").

That means that any relief at the preliminary-injunction stage will necessarily be limited to the three named plaintiffs, because no class has been certified and the Court lacks authority to award preliminary relief that extends beyond the parties to this lawsuit. *See Califano* v. *Yamasaki*, 442 U. S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*" (emphasis added)); *United States v. National Treasury Employees Union,* 513 U.S. 454, 477–78 (1995) ("[W]e neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants"); *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2088 (2017) (staying a preliminary injunction to the extent it reached beyond the named litigants and protected "foreign nationals abroad who have no connection to the United States at

all").[16] Although the plaintiffs moved for class certification and sought class-wide relief at the preliminary-injunction stage, they cannot obtain class-wide relief from this Court given the district court's steadfast refusal to rule on their class-certification motion. *See Davis v. Romney,* 490 F.2d 1360, 1366 (3d Cir. 1974) ("Relief cannot be granted to a class before an order has been entered determining that class treatment is proper.").

So any preliminary injunction would necessarily be limited to the three plaintiffs in this case—Sherice Sargent, Michele Sheridan, and Joshua Meyer—and their children who wish to enroll at Carver, Palumbo, and Master-

---

16.  Although there have been rare occasions in which this Court has issued so-called "nationwide" or "universal" preliminary injunctions, *see Pennsylvania v. President United States*, 930 F.3d 543, 575–76 (3d Cir. 2019) (affirming nationwide preliminary injunction against Trump Administration's religious exemptions to the contraceptive mandate), the legality of this maneuver is dubious and the plaintiffs are not requesting such a remedy on this appeal. *See Dep't of Homeland Security v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("The real problem here is the increasingly common practice of trial courts ordering relief that transcends the cases before them. Whether framed as injunctions of 'nationwide,' 'universal,' or 'cosmic' scope, these orders share the same basic flaw—they direct how the defendant must act toward persons who are not parties to the case."); *Trump v. Hawaii*, 138 S. Ct. 2392, 2426 (2018) (Thomas, J., concurring) (criticizing the practice of awarding "nationwide" or "universal" injunctions); John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J. On Reg. Bull. 37, 40 (2020) ("[U]niversal remedies can go beyond vindicating the rights of the plaintiff, and so go beyond the Article III case or controversy the plaintiff has presented and that the court has power to decide.").

man. Ordering those students admitted to their respective schools while this litigation proceeds will not impose irreparable harm on the school district, as it would add only one student to three of the city's criteria-based schools. And it is undisputed that Ms. Sargent's daughter, Ms. Sheridan's son, and Mr. Meyer's son would have been admitted to Carver, Palumbo, and Masterman (respectively) under the previous system of admissions.

And any administrative inconveniences that the city might assert cannot be used to thwart injunctive relief if the Court concludes that the school district is violating the Constitution and federal civil-rights laws—especially when the plaintiffs and their children will suffer irreparable harm in the absence of a preliminary injunction. If the Court agrees that the new admissions regime is not only harmful but unlawful, then it is constitutionally obligated to enjoin its application with respect to the named plaintiffs. *See* Charles Alan Wright & Arthur R. Miller, et al., 11A Fed. Prac. & Proc. Civ. § 2948.2 (3d ed.) ("[W]hen plaintiff is claiming the loss of a constitutional right, courts commonly rule that even a temporary loss outweighs any harm to defendant and that a preliminary injunction should issue.").

## CONCLUSION

The district court's order denying the preliminary injunction should be reversed, and the case should be remanded for further proceedings. The Court should instruct the district court on remand to enter a preliminary injunction allowing Ms. Sargent's daughter to attend Carver, Ms. Sheridan's

son to attend Palumbo, and Mr. Meyer's son to attend Masterman until the

conclusion of proceedings in the district court.

Respectfully submitted.

 /s/ Jonathan F. Mitchell 

WALTER S. ZIMOLONG
Zimolong LLC
Post Office Box 552
Villanova, Pennsylvania 19085
(215) 665-0842
wally@zimolonglaw.com

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

GENE P. HAMILTON
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

Dated: November 2, 2022

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF BAR MEMBERSHIP

I certify that I am a member of the U.S. Court of Appeals for the Third
Circuit.


                                           /s/ Jonathan F. Mitchell
                                          JONATHAN F. MITCHELL
Dated: November 2, 2022                    *Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

### with type-volume limitation, typeface requirements, and type-style requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,701 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it uses Equity Text B 14-point type face throughout, and Equity Text B is a proportionally spaced typeface that includes serifs.

3. The text of the electronically filed brief is identical to the text in the paper copies that will be provided.

4. The electronically filed brief has been scanned with the most recent version of VirusTotal and is free from viruses.

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiffs-Appellants*

Dated: November 2, 2022

## CERTIFICATE OF SERVICE

I certify that on November 2, 2022, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Third Circuit and served through CM/ECF upon:

William Kennedy
Montgomery McCracken Walker & Rhoads LLP
1735 Market Street
Philadelphia, Pennsylvania 19103-7505
(215) 772-7291 (phone)
(215) 731-3689 (fax)
wkennedy@mmwr.com

*Counsel for Defendants-Appellees*

/s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Plaintiffs-Appellants*

No. 22-2493

# In the United States Court of Appeals for the Third Circuit

———————

Sherice Sargent, individually, as next friend of her minor child, and on behalf of those similarly situated; Michele Sheridan, individually, as next friend of her minor child, and on behalf of those similarly situated; and Joshua Meyer, individually, as next friend of his minor child, and on behalf of those similarly situated,

*Plaintiffs-Appellants*,

v.

The School District Of Philadelphia, et al.,

*Defendants-Appellees*,

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania, Philadelphia Division
Case No. 2:22-cv-01509-CFK

———————

## APPENDIX — VOLUME 1 OF 3, pp. 1–24

———————

Walter S. Zimolong
Zimolong LLC
Post Office Box 552
Villanova, Pennsylvania 19085
(215) 665-0842
wally@zimolonglaw.com

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Notice of Appeal (ECF No. 52)............................................................ Appx1

Order Denying Motion for Preliminary Injunction (ECF No. 51) ......... Appx3

Opinion Denying Motion for Preliminary Injunction (ECF No. 50) .....Appx4

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA
### PHILADELPHIA DIVISION

**Sherice Sargent**, et al.,

        Plaintiffs,

v.

**The School District of Philadelphia**, et al.,

        Defendants.

Case No. 2:22-cv-01509-CFK

## NOTICE OF APPEAL

    Plaintiffs Sherice Sargent, Michele Sheridan, and Joshua Meyer appeal to the United States Court of Appeals for the Third Circuit from the order denying the plaintiffs' motion for preliminary injunction, entered on August 8, 2022 (ECF No. 51).

Dated: August 11, 2022

Respectfully submitted.

WALTER S. ZIMOLONG III
Pennsylvania Bar No. 89151
Zimolong, LLC
Post Office Box 552
Villanova, Pennsylvania 19085-0552
(215) 665-0842 (phone)
wally@zimolonglaw.com

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
Pennsylvania Bar No. 91505
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

GENE P. HAMILTON*
Virginia Bar No. 80434
Vice-President and General Counsel
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

\* admitted *pro hac vice*

*Counsel for Plaintiffs and
the Proposed Classes*

Appx1

## CERTIFICATE OF SERVICE

I certify that on August 11, 2022, I served this document through CM/ECF upon:

WILLIAM KENNEDY
Montgomery McCracken Walker & Rhoads LLP
1735 Market Street
Philadelphia, Pennsylvania 19103-7505
(215) 772-7291 (phone)
(215) 731-3689 (fax)
wkennedy@mmwr.com

*Counsel for Defendants*

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiffs and
the Proposed Classes*

Appx2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SHERICE SARGENT, et al.,** | : | **CIVIL ACTION** |
| *Plaintiffs*, | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THE SCHOOL DISTRICT OF** | : | |
| **PHILADELPHIA, et al.,** | : | |
| *Defendants.* | : | **NO. 22-cv-1509** |
| | : | |

## ORDER

   **AND NOW,** this **8th day** of **August, 2022**, upon consideration of Plaintiffs' Motion for a Preliminary Injunction (ECF No. 32), Defendants' Response in Opposition (ECF No. 37), Plaintiffs' Reply (ECF No. 41), and the Stipulated Facts (ECF No. 44) and Exhibits (ECF No. 44 Exhibits 1–9), as well as the argument presented at the Preliminary Injunction Hearing (*see* ECF No. 47) **hereby ORDERED** that for the reasons set forth in the accompanying Memorandum, Plaintiffs' Motion for a Preliminary Injunction (ECF No. 32) is **DENIED**.

                                           **BY THE COURT**

                                           /s/ *Chad F. Kenney*
                                           _____
                                           **CHAD F. KENNEY, JUDGE**

**Appx3**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHERICE SARGENT, et al., | : | CIVIL ACTION |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | |
| | : | |
| THE SCHOOL DISTRICT OF | : | |
| PHILADELPHIA, et al., | : | |
| *Defendants.* | : | NO. 22-cv-1509 |
| | : | |

## MEMORANDUM

KENNEY, J.                                                                                   August 8, 2022

## I.     INTRODUCTION

Plaintiffs[1] allege that in 2021, Defendant[2] the School District of Philadelphia (the

"School District") adopted a "blatantly unconstitutional race-based system for admission to its

criteria-based public schools."[3] ECF No. 31 at 2. According to Plaintiffs, the changes to the

---

[1] Plaintiffs are identified in the First Amended Complaint (ECF No. 31) as Sherice Sargent, individually, as next friend of her minor child, and on behalf of those similarly situated, Fallon Girini, individually, as next friend of her minor child, and on behalf of those similarly situated, Michele Sheridan, individually, as next friend of her minor child, and on behalf of those similarly situated, and Joshua Meyer individually, as next friend of his minor child, and on behalf of those similarly situated. ECF No. 31 at 1.

[2] The additional Defendants are identified in the First Amended Complaint (ECF No. 31) as William R. Hite, in his official capacity as Superintendent of the School District of Philadelphia; Board of Education, the School District of Philadelphia; Joyce Wilkerson, Leticia Egea-Hinton, Julia Danzy, Mallory Fix Lopez, Maria Mccolgan, Lisa Salley, Reginald Streater, and Cecelia Thompson, each in their official capacities as members of the Board of Education of the School District of Philadelphia; Sabriya Jubilee, in her official capacity as director of diversity, equity, and inclusion for the School District of Philadelphia; and Karyn Lynch, in her official capacity as chief of student support services for the School District of Philadelphia. ECF No. 31 at 1

[3] Additional explanation as to the specific claims brought by Plaintiffs is provided in greater detail below. *See infra* Section II.A at 4.

Appx4

admissions process were enacted "for the illegal and unconstitutional purpose of achieving racial balancing at the city's elite [criteria-based] schools[.]" ECF No. 32 at 1. Presently before the Court is Plaintiffs' Motion for a Preliminary Injunction (ECF No. 32), asking this Court to "enjoin the [D]efendants from implementing their changes to the selection standards for the city's [criteria-based] schools." ECF No. 32 at 1. In large part, Plaintiffs' request for a preliminary injunction hinges on their interpretation of a single sentence from a Philadelphia School District Board of Education policy document, which Plaintiffs aver is "as close to a smoking gun as can be imagined." ECF No. 41 at 1; *see also* ECF No. 44 Ex. 5. Plaintiffs claim that the language in this policy document, "announces a [racial] *quota*" system as a "first step on the road to an enforced proportional-representation regime, in which school officials will consciously and continuously stamp out deviations that arise between the racial composition of the city's criteria-based schools and the racial makeup of the city's population." ECF No. 41 at 1–2 (emphasis in original).

Yet, this Court finds that Plaintiffs' so-called "smoking gun" is, at this stage, merely smoke, as the plain language of the policy statement does not provide what Plaintiffs claim that it does, and Plaintiffs' interpretation of its meaning is, as of yet, unsupported by the record. Rather than announcing a racial quota system for admission to certain schools, the policy statement plainly articulates that, as an "[i]ndicator" of whether or not the School District is succeeding in its efforts to protect student-potential from practices that "perpetuate systemic racism," it will look to whether the number of "Black/African American" and "Hispanic/Latinx" students who are achieving the rigorous qualifications required to attend the School District's criteria-based schools is increasing. ECF No. 44 Ex. 5 at 4. The remainder of the stipulated facts and evidence do not support the conclusion that any changes to the admissions process for the criteria-based

**Appx5**

schools were made with racially discriminatory intent. Accordingly, and for the reasons set forth in greater detail below, this Court finds that Plaintiffs have failed to show a reasonable probability of eventual success on the merits, which is a necessary steppingstone on the path toward a preliminary injunction. Because Plaintiffs have failed to meet this burden, the Court will DENY Plaintiffs' Motion for a Preliminary Injunction (ECF No. 32).

## II.   BACKGROUND

### A.  Procedural History

On April 19, 2022, Plaintiffs[4] filed their initial Complaint in the United States District Court for the Eastern District of Pennsylvania. ECF No. 1. In the request for relief section of their Complaint, Plaintiffs stated that they were seeking a preliminary injunction. *See* ECF No. 1 ¶ 77. On May 10, 2022, Plaintiffs filed a Motion to Certify Class. ECF No. 22. On May 12, 2022, the Court denied Plaintiffs' Motion to Certify Class, without prejudice, to be resubmitted for consideration after the close of pleadings and after a ruling had been made on the demand for a preliminary injunction. ECF No. 23.

Also on May 12, 2022, the Court issued an Order scheduling a Pre-Preliminary Injunction Hearing and requiring that the parties meet and confer and draft a Proposed Scheduling Order to "determine a proposed schedule for the remainder of the pleadings and the preliminary injunction briefings, discovery, and hearing." ECF No. 24 at 1. The Court's Order (ECF No. 24) specifically provided that "[t]he [preliminary injunction] discovery schedule should take into account the taking of any depositions…," and also stated that "the parties should

---

[4] Plaintiffs in the initial Complaint were identified as follows, Sherice Sargent, individually, as next friend of her minor child, and on behalf of those similarly situated, Fallon Girini, individually, as next friend of her minor child, and on behalf of those similarly situated, and Michele Sheridan, individually, as next friend of her minor child, and on behalf of those similarly situated. ECF No. 1.

Appx6

make every effort to stipulate to facts and to only take depositions on outstanding factual issues that require credibility determinations." ECF No. 24 at 2.

On May 19, 2022, the parties submitted a Joint Proposed Scheduling Order. ECF No. 25. Rather than electing to conduct pre-preliminary injunction discovery, including depositions, the parties chose to stipulate to a set of pertinent facts. *See* ECF No. 25; *see also* ECF No. 44. Specifically, in the Joint Proposed Scheduling Order, the parties stated that they "intend[ed] to stipulate to the facts relevant to the [P]laintiffs' motion for preliminary injunction, and [that] they expect[ed] their stipulation to obviate any need for discovery before the preliminary-injunction hearing." ECF No. 25 at 1.

On June 2, 2022, Plaintiffs filed their First Amended Complaint asserting three claims of race-based discrimination. ECF No. 31 at 1. Specifically, Plaintiffs alleged, pursuant to 42 U.S.C. § 1983, violations of both Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Count I) and the Equal Protection Clause of the Fourteenth Amendment (Count II). Plaintiffs also alleged violations of Article I, § 26 and Article I, § 29 of the Pennsylvania Constitution (Count III).

Also on June 3, 2022, Plaintiffs filed their Motion for a Preliminary Injunction. ECF No. 32. On June 12, 2022, Plaintiffs filed a Proposed Order in relation to their Motion for a Preliminary Injunction. ECF No. 33. The Proposed Order outlines proposed relief including, enjoining Defendants from "implementing the changes that the School District of Philadelphia adopted in 2021 governing the admission of students to the city's criteria-based or magnet schools" and ordering Defendants "to return to the admissions policies that existed before the [D]efendants changed those policies in 2021," as well as enjoining Defendants "from using race to determine the admission of students to the city's criteria-based or magnet schools" and "from

4

**Appx7**

changing the admissions policies to the city's criteria-based or magnet schools if those changes are made for the purpose of altering the racial makeup of those schools." ECF No. 33 at 1–2.

On June 29, 2022, Defendants filed a Response in Opposition to Plaintiffs' Motion for a Preliminary Injunction. ECF No. 37. Plaintiffs then filed a Reply on July 13, 2022. ECF No. 41. In their Reply, Plaintiffs argued that the Court has discretion as to the scope of relief and that the Court could choose to enjoin Defendants from implementing the changes to the Admissions Policy for the 2022–2023 school year or order that just the named Plaintiffs be admitted to their preferred schools. ECF No. 41 at 11.

On July 21, 2022, the parties submitted Stipulated Facts containing a set of 9 (nine) exhibits as follows: Ex. (1) High School Directory, Fall 2021 Admissions; Ex. (2) High School Directory, Fall 2022 Admissions; Ex. (3) School District's Current web page, describing in FAQ form, the 2021–22 high school admissions process; Ex. (4) School District's web page describing, in FAQ form, the 2020–21 high school admission process; Ex. (5) Board of Education Goals & Guardrails (the "Goals & Guardrails"); Ex. (6) School District's Research Brief: Enrollment, 9th Grade Student Enrollment in District High Schools by Home Zip Code, 2017–18 to 2020–21; Ex. (7) 2020 census data for each general residential zip code in Philadelphia; Ex. (8) Transcript of December 14, 2021 hearing—City of Philadelphia, Committee on Education; and Ex. (9) Copies of the "school profiles" web pages for Masterman, Central, Carver and Palumbo.  ECF No. 44 Exhibits 1–9.

On July 27, 2022, a Preliminary Injunction Hearing was held before this Court.

**Appx8**

### B. Findings of Fact

The Court adopts and incorporates herein the Stipulated Facts (ECF No. 44, including Exhibits 1–9) as set forth by the parties for purposes of ruling on Plaintiffs' Motion for a Preliminary Injunction (ECF No. 32). ECF No. 44.

## III.   STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC,* 774 F.3d 192, 197 (3d Cir. 2014) (quoting *Winter* v. *Natural Res. Def Council, Inc.,* 555 U.S. 7, 24 (2008)). Accordingly, granting preliminary injunctive relief is only appropriate "upon a clear showing that the plaintiff is entitled to such relief." *Winter,* 555 U.S. at 22; *see also Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–130 (2d ed. 1995) ("a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion"). As the Third Circuit has long instructed, "upon application for a preliminary injunction to doubt is to deny." *Madison Square Garden Corp. v. Braddock,* 90 F.2d 924, 927 (3d Cir. 1937); *see also Talbert v. Corr. Dental Assocs.*, No. CV 18-5112, 2019 WL 6460499, at *2 (E.D. Pa. Nov. 29, 2019) (quoting *Madison Square Garden Corp.,* 90 F.2d at 927) ("Our Court of Appeals instructs, 'upon an application for a preliminary injunction to doubt is to deny.'"); *see also Stephan Zouras LLP v. Marrone*, No. 3:20-CV-2357, 2021 WL 5154159, at *5 (M.D. Pa. June 9, 2021), *report and recommendation adopted sub nom. Stephen Zouras, LLP v. Marrone*, No. CV 3:20-2357, 2022 WL 107186 (M.D. Pa. Jan. 11, 2022) (same).

To meet this lofty burden, the Third Circuit requires that a moving party show "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably

Appx9

injured ... if relief is not granted…" *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017). If those two factors are met, district courts "should [additionally] take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id.* The Third Circuit has made clear that the first two factors, that is "a reasonable probability of eventual success in the litigation," and whether the moving party "will be irreparably injured ... if relief is not granted…," are "the most critical factors" and are to be treated as "gateway factors." *Id.* at 176, 179. In other words, "a movant for preliminary equitable relief **must meet** the threshold for the first two…," and only "[i]f these gateway factors are met," should "a court then consider[] the remaining two factors and determine[] in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179–180.

## IV.    DISCUSSION

### A.  Plaintiffs Have Failed to Establish a Reasonable Probability of Eventual Success in the Litigation.

#### 1.  Legal Standard

To establish a reasonable probability of eventual success in the litigation, a moving party "must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not)[.]" *Reilly*, 858 at 179.

In the present case, Plaintiffs' Amended Complaint asserts three counts of racial discrimination against Defendants. Specifically, Plaintiffs allege, pursuant to 42 U.S.C. § 1983, violations of both Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Count I) and the Equal Protection Clause of the Fourteenth Amendment (Count II). Plaintiffs also allege violations of Article I, § 26 and Article I, § 29 of the Pennsylvania Constitution (Count III). The

Appx10

Court finds that all three of these claims are analyzed pursuant to the standards the United States Supreme Court uses in reviewing federal equal protection claims. *See Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (the prohibitions of the Equal Protection Clause and Title VI are co-extensive); *see also Regents of Univ. of California v. Bakke*, 438 U.S. 265, 287, 98 S.Ct. 2733 (1978) (opinion of Powell, J.) ("Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause"); *Doe ex rel. Doe v. Lower Merion School Dist.*, 665 F.3d 524, 557 (3d Cir. 2011) ("*Lower Merion*") (explaining same); *Com. v. Albert*, 758 A.2d 1149, 1151 (Pa. 2000) (Article I, § 26 of the Pennsylvania Constitution is analyzed under the same standards that the United States Supreme Court uses in reviewing federal equal protection claims).[5]

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction equal protection of the laws." U.S. Const. amend. XIV § 1. When considering claims of racial discrimination, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Lower Merion*, 665 F.3d at 543 (citing *Antonelli v. New Jersey*, 419 F.3d 267, 274 (3d Cir. 2005) (quoting *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194, 123 S.Ct. 1389, 155 L.Ed.2d 349 (2003)) (internal citations and quotation marks omitted in *Antonelli*).

---

[5] The Court notes that Section 29 of the Pennsylvania Constitution (added May 18, 2021) has not yet been subject to any reported judicial construction, and that the Court finds no basis to find that Section 29—which expressly bars the denial or abridging of "[t]he equality of rights under the law" on the basis of "race or ethnicity"—would be construed differently than the more generally worded Section 26, which does not mention race or ethnicity. Accordingly, the Court finds it appropriate, here, to also analyze Section 29 under the federal equal protection standards. *Compare* Pa. Const. art I, § 26 ("[n]o discrimination by Commonwealth and its political subdivisions") *with* Pa. Const. art I, § 29 ("[p]rohibition against denial or abridgment of equality of rights because of race and ethnicity").

Appx11

The Supreme Court has recognized three circumstances that show intentional race-based discrimination. First intentional racial discrimination can be shown when "a law or policy explicitly classifies citizens on the basis of race." *Lower Merion*, 665 F.3d at 543 (citing *Hunt v. Cromartie*, 526 U.S. 541, 119 S.Ct. 1545 (1999)). Second, intentional race-based discrimination can also be shown when a "facially neutral law or policy is applied differently on the basis of race." *Id.* (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064 (1886)). Lastly, when "a facially neutral law or policy that is applied evenhandedly is motivated by discriminatory intent and has a racially discriminatory impact" it can demonstrate intentional race-based discrimination. *Id.* (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555 (1977)).

When considering Equal Protection challenges, courts "apply strict scrutiny to actions with racially discriminatory purposes," meaning that the action is either an explicit racial classification imposed by government, it is a policy or law being applied differently on the basis of race, or it is a policy or law for which a plaintiff establishes a discriminatory race-based purpose. *Id.* (citing *Grutter*, 539 U.S. at 327, 123 S.Ct. 2325; *Yick Wo*, 118 U.S. 356, 6 S.Ct. 1064; *Pryor v. Nat'l Collegiate Athletic Ass'n,* 288 F.3d 548, 562 (3d Cir. 2002)). "[A]bsent a racially discriminatory purpose, explicit or inferable, on the part of the [decisionmaker], the statutory distinction is subject only to rational basis review." *Id.* at 544.

Whether a law or policy has a racially discriminatory purpose, is a "'sensitive inquiry' into the available 'circumstantial and direct evidence of intent." *Id.* at 552 (citing *Arlington Heights*, 429 U.S. at 266–68, 97 S.Ct. 555). Courts should consider, "(1) whether the official action has a racially disproportionate impact; (2) the historical background of the decision; and

Appx12

(3) the legislative or administrative history of the decision." *Id.* (citing *Arlington Heights*, 429 U.S. at 266–68, 97 S.Ct. 555).

### 2. Analysis

For the reasons set forth below, this Court finds that Plaintiffs have failed to show reasonable probability of eventual success on the merits. Specifically, this Court finds that (a) Plaintiffs have failed to show that there is a reasonable probability that the changes to the 2021–2022 admissions process for the School District's criteria-based schools were motivated by a racially discriminatory purpose, and thus, this Court cannot conclude that there is a reasonable probability such policy changes would be evaluated under strict scrutiny; (b) Plaintiffs have failed to show that there is a reasonable probability that the changes to the admissions process for the criteria-based schools would fail under a rational basis review; and finally (c) even if these policy changes were subject to strict scrutiny review, Plaintiffs have failed to show a reasonable probability of eventual success on the merits because they have not shown any evidence that the changes to the admissions policy have had a racially discriminatory impact.

**a. Plaintiffs Have Failed to Show That There Is a Reasonable Probability That the Changes to the Admissions Policy Will be Subject to Strict Scrutiny.**

Plaintiffs argue that they have shown that they have a reasonable probability of proving that the changes to the admissions policy for the 2021–2022 admissions process to the School District's criteria-based schools were motivated by a racially discriminatory purpose, and thus, there is a reasonable probability that the relevant standard of review will be strict scrutiny. According to Plaintiffs, they have, therefore, shown a reasonable probability of eventual success on the merits because strict scrutiny is a difficult hurdle to overcome, and Defendants will not be able to show that the changes were narrowly tailored to a compelling state interest. *See* ECF No.

Appx13

32 at 16; *see also Grutter*, 539 U.S. at 326. Based on the current record, however, this Court cannot find that there is a reasonable probability Plaintiffs will successfully prove that the changes to the admissions policy for the 2021–2022 admissions process were implemented for a racially discriminatory purpose or that they have had a racially discriminatory impact, and thus, Plaintiffs have failed to show that there is a reasonable probability that such policy changes will be subject to strict scrutiny review.

As set forth in the Stipulated Facts, it is undisputed that the School District made changes to the 2021–2022 admissions process for criteria-based schools. ECF No. 44 ¶ 24. Specifically, "[t]he School District changed its admission[s] process for all criteria-based schools by admitting qualified students to these schools by lottery." ECF No. 44 ¶ 24. Additionally, "[t]he 2021-22 admission process provided qualified students residing in six specified zip codes—19121, 19132, 19133, 19134, 19135, and 19140—with preference in the lottery for admission to" Julia R. Masterman High School ("Masterman"), Central High School ("Central"), George Washington Carver High School of Engineering and Science ("Carver") and Academy at Palumbo ("Palumbo"). ECF No. 44 ¶ 25; *see also* ECF No. 44 Ex. 2 at 4 ("[z]ip code preference will be applied at select criteria-based schools for students who meet minimum qualifications"). Under the zip code preference policy, "[i]f a student was qualified to attend [Palumbo, Carver, Central or Masterman] applied for admission, and resided in one of those six specified zip codes, the student would automatically receive admission to that school." ECF No. 44 ¶ 25. Palumbo, Carver, Central and Masterman each have their own set of requirements that determine whether or not a student is qualified for admission (i.e., able to participate in the lottery for a spot at that school). *See* ECF No. 44. Ex. 2 at 19, 25, 26, 49 (providing the fall 2022 admissions requirements at Palumbo, Carver, Central and Masterman, respectively).

11

Appx14

In the spring of 2021, the School District of Philadelphia Board of Education approved a "Goals & Guardrails" policy document. The Goals & Guardrails document includes a general vision statement and lays out a series of "Goals" and "Guardrails" consistent with that vision. ECF No. 44 Ex. 5. In the final section of the Goals & Guardrails, entitled "Addressing Racist Practices," the document includes "Guardrail 4," which provides that "[o]ur students' potential will not be limited by practices that perpetuate systemic racism and hinder student achievement." ECF No. 44 Ex. 5 at 4. Under the Guardrail 4 section heading, the document lists two "[i]ndicators" (Indicator 4.1 and Indicator 4.2). Relevant here, "Indicator 4.1" provides,

> Among 8th grade students who are *qualified* to attend Special Admission High schools [sic], the percentage who are Black/African American or Hispanic/Latinx will grow from 33.8% in August 2020 to at least 52.0% (making progress toward being proportional to population as a whole) by August 2026.

ECF No. 44 Ex. 5 at 4 (emphasis added).

Plaintiffs allege that the language in Indicator 4.1 followed by changes to the 2021–2022 admissions process for the School District's criteria-based schools, demonstrates that such changes were instituted for a racially discriminatory purpose. Plaintiffs state that, "[t]he [S]chool [D]istrict is not even attempting to hide its racial motivations and it proudly proclaims that it 'will' increase [B]lack and Hispanic enrollment to its announced quota of 'at least 52.0%.'" ECF No. 32 at 15. Plaintiffs claim that within Indicator 4.1 the School District "announces that this will be only the *first* step in a five-year march toward racially proportional representation in the city's [criteria-based] schools." ECF No. 32 at 15 (emphasis in original).

This Court finds, however, that Plaintiffs' characterization of Indicator 4.1 is contrary to its plain language and unsupported by the current record. *See* ECF No. 44 Ex. 5 at 4. By its plain language, Indicator 4.1 does not address, at all, increasing the number of Black/African American or Hispanic/Latinx students who are *admitted to* or who *attend* the School District's

criteria-based schools, rather Indicator 4.1 addresses increasing the number of Black/African American or Hispanic/Latinx students who are *qualified* to attend such schools. *Id.* Specifically, the Goals & Guardrails document provides that as an "[i]ndicator" of whether or not the School District is achieving Guardrail 4, that is ensuring that student-potential is "not be[ing] limited by practices that perpetuate systemic racism and hinder student achievement," the School District will look to whether the number of Black/African American and Hispanic/Latinx students who are able to meet the rigorous requirements necessary to qualify for admission to the School District's criteria-based schools is increasing and "making progress toward being proportional to [the demographics of the] population as a whole." *Id.* As Plaintiffs' counsel agreed at the Preliminary Injunction Hearing, "[t]here's absolutely nothing wrong with a school district saying that we want to improve academic performance among any particular group, racial or non-racial." ECF No. 47 Tr. 29:15–18.

Plaintiffs contend that because the School District also controls the qualifications for admissions to the criteria-based schools, one can infer from the language of Indicator 4.1 that the changes to the 2021–2022 admissions process were made for a racially discriminatory purpose. *See* ECF No. 47 Tr. 25: 1–4 ("the [C]ity…will define the scope of qualified applicants according to these racial goals they put forth in the [G]oals and [G]uardrails document). Yet, the Court finds this jump in logic too attenuated to support such inference and unsupported by the record. Plaintiffs have not identified any changes made by the School District to the *qualifications* required for admittance to Palumbo, Carver, Masterman or Central, (or any of the School District's criteria-based schools) that would benefit any one race of students over another. To

13

Appx16

qualify for a spot in the admissions lottery, students are all held to the same race-neutral standards.[6]

Plaintiffs also argue that statements made by two School District employees, Defendant Sabriya Jubilee, the School District's Chief of Equity, Office of Diversity, Equity, and Inclusion ("Dr. Jubilee") and Defendant Karyn Lynch, the School District's Chief of Student Support Services ("Ms. Lynch"), at a December 15, 2021 Council of the City of Philadelphia Committee on Education Public Hearing (the "Public Hearing"), support the conclusion that the changes to the admissions policy were instituted for a racially discriminatory purpose.

During the Public Hearing, Dr. Jubilee discussed the School District's commitment to "becoming an anti-racist equitable organization by uprooting policies, deconstructing processes and eradicating practices that create systems of privilege and power for one group over the other." ECF No. 44 Ex. 8 Tr. 84:19–24. Dr. Jubilee spoke generally about "dismantling institutionalization of norms" and specified that "[t]he upending of privilege" she was highlighting was "not simply in reference to a configuration of numbers or an assessment of differences in skin color or features." ECF No. 44 Ex. 8 Tr. 84:25–85:10. In direct reference to the "school selection process" Dr. Jubilee stated that "we have the opportunity to redesign a process that from inception to current practice has only truly benefited a small group of stakeholders, many of whom do not reflect the majority demographic of our School District or

---

[6] The Court notes that a review of the relevant admission qualifications for Palumbo, Carver, Central, and Masterman from the fall of 2021 to the fall of 2022 indicates that, at least to some extent, the qualifications have become more rigorous. For example, to qualify for fall 2022 admission at Palumbo, Carver, Central, or Masterman, students were required to have earned exclusively A's and B's, whereas to qualify for fall 2021 admission to any of these schools, students were permitted a possible exception of one C. *Compare* ECF No. 44 Ex. 2 at 19, 25, 26, 49 (providing Palumbo, Carver, Central and Masterman fall 2022 admissions requirements, respectively) *with* ECF No. 44 Ex. 1 at 19, 24, 25, 48, (providing Palumbo, Carver, Central and Masterman fall 2021 admissions requirements, respectively).

Appx17

City." ECF No. 44 Ex. 8 Tr. 85:11–21. Likewise, Ms. Lynch explained with respect to the previous admissions process for criteria-based schools that "[w]e've known for year[s] that this process is inequitable and in some cases not even equal." ECF No. 44 Ex. 8 Tr. 102:23–25.

Upon review of the transcript of the Public Hearing, (*see* ECF No. 44 Ex. 8), and in particular, the statements emphasized by Plaintiffs' counsel at the Preliminary Injunction Hearing (*see e.g.*, ECF No. 47 Tr. 48:5–49:18), the Court finds that none of the statements made by Dr. Jubilee or Ms. Lynch demonstrate that the changes to the admissions policy were instituted for a racially *discriminatory* purpose. The Third Circuit has made clear that "[t]he consideration or awareness of race while developing or selecting a policy…is not in and of itself a racial classification." *Lower Merion*, 665 F.3d at 548. Further, the Third Circuit has specifically provided that "[d]esigning a policy 'with racial factors in mind' does not constitute a racial classification if the policy is facially neutral and is administered in a race-neutral fashion." *Id*.

Consideration of whether prior practices allowed for racial bias to exist in the admissions process and a desire to safeguard against the potential for race-based-discrimination by moving to an objective system for selecting which students are admitted to the schools they are qualified to attend does not constitute a racially *discriminatory* motive. It constitutes the opposite. *See Lower Merion*, 665 F.3d at 548 ("the mere awareness or consideration of race should not be mistaken for racially discriminatory intent or for proof of an equal protection violation"); *id.* ("[r]acially discriminatory purpose means that the decisionmaker adopted the challenged action at least partially because the action would benefit or burden an identifiable group").

Additionally, the 2020 Census data providing the racial demographics for each zip code located within the School District, also does not support Plaintiffs' contention that the zip code

preference policy was motivated by a racially discriminatory purpose. As Defense counsel pointed out at the Preliminary Injunction Hearing, the six zip codes at issue "are not the {quote} 'blackest' zip codes, they are not the {quote} 'whitest' zip codes." ECF No. 47 Tr. 14:18–19; *see also* ECF No. 44 Ex. 7. Moreover, the criteria-based schools that the zip code preference policy applies to are racially diverse in distinct ways, (e.g., Palumbo in 2020–2021 was 36% Asian, 34% Black/African American, 15% white, 11% Hispanic/Latino, and 4% other, whereas Carver was 14% Asian, 61% Black/African, 8% white, 11% Hispanic/Latino and 6% other). *See* ECF No. 44 ¶ 28 (providing the racial demographics for Palumbo, Carver, Central, Masterman and the Philadelphia School District for the 2020–2021 school year). This data-supported-reality logically cuts against Plaintiffs' assertion that the zip code preference policy was instituted to move the student populations of Palumbo, Carver, Central, and Masterman toward the ultimate goal of having the population at each of these schools mirror the racial demographic breakdown of the City of Philadelphia as whole. To actually achieve that alleged goal through zip code preference, it appears, given the data, that each of the schools would need a school-specific admissions policy preferencing different zip codes with distinct racial demographics targeted to that school's unique racial breakdown.

There is no dispute that the changes to the 2021–2022 admissions process to the School District's criteria-based schools are facially neutral or that the admissions process is being administered in a race neutral fashion, and there is, likewise, no dispute that, presently, there is no evidence before the Court that the changes to the admissions process are resulting in a racially discriminatory impact. There is, thus, no indication from the record that Plaintiffs will be able to prove the changes to the admissions policy for the 2021–2022 admissions process for the School District's criteria-based schools were instituted for a racially discriminatory purpose or with

racially discriminatory intent. Accordingly, there is no evidence on which this Court could find that there is a reasonable probability that the changes to admissions policies to the criteria-based schools will be reviewed under strict scrutiny. *Lower Merion*, 665 F.3d at 548 ("The Court has never held that strict scrutiny should be applied to a school plan in which race is not a factor merely because the decisionmakers were aware of or considered race when adopting the policy. When there is no racial classification in the plan, strict scrutiny is only applied if plaintiffs show discriminatory intent."); *see also Boston's Child. First v. City of Bos.*, 62 F. Supp. 2d 247, 260 (D. Mass. 1999), *aff'd sub nom. Anderson ex rel. Dowd v. City of Bos.*, 375 F.3d 71 (1st Cir. 2004) (concluding that based on the record available at the time of the court's preliminary injunction decision it could not determine whether "either side [was] likely to succeed on the merits").

b. **Plaintiffs Have Failed to Show a Reasonable Probability of Success on the Merits Because They Have Failed to Show That the Changes to the 2021–2022 Admissions Process for Criteria-Based Schools Would Not Be Able to Withstand Rational Basis Review.**

Plaintiffs have failed to show a reasonable probability of success on the merits because they have failed to show that the changes to the admissions policy fail rational basis review. For a policy to be found constitutional under a rational basis review, "the challenged classification must be upheld if it is 'rationally related to a legitimate state interest.'" *Lower Merion*, 665 F.3d at 556 (citing *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513 (1976) (per curiam)). Under this deferential standard and based on the current record, the Court finds that Defendants would almost certainly be able to prove that the changes to the admissions policy

Appx20

were rationally related to a legitimate government interest, and Plaintiffs have not provided any evidence that allows this Court to find otherwise.

The evidence before the Court shows that the six zip codes given preference in the lottery selection system for admission to Carver, Central, Masterman and Palumbo (that is, 19121, 19132, 19133, 19134, 19135, and 19140) are the six zip codes that for the last four years have had the lowest "[p]ercent of [f]irst-[t]ime 9th [g]raders" who "[e]nrolled at Carver, Central, Masterman and Palumbo."[7]  ECF No. 44. Ex. 6 at 10–11. Based on this data, the Court finds that there are a variety of legitimate state interests that are rationally related to the policy decision to give qualified students in these six zip codes preference in the lottery selection system to Carver, Central, Masterman, and Palumbo, including, *inter alia*, the goal of ensuring that all *qualified* students, regardless of where they are located geographically within the City of Philadelphia, have equal access to the School District's elite criteria-based schools.

---

[7] Specifically, Table 4 in the School District's Research Brief addressing 9th Grade Enrollment in District High School by Home Zip Code, 2017–18 to 2020–21 (ECF No. 44 Ex. 6) provides the total number of first-time 9th graders enrolled in any School District school by zip code from 2017–2018 to 2020–21, as well as the total number of 9th graders enrolled at Carver, Central, Masterman and Palumbo by zip code from 2017–2018 to 2021–21. ECF No. 44 Ex. 6 at 10–11. Based on this information, Table 4 also calculates the percent of first-time 9th graders from each zip code that enrolled at Carver, Central, Masterman, and Palumbo. ECF No. 44 Ex. 6 at 10–11. Table 4 clearly shows that the six zip codes given preference, 19121, 19132, 19133, 19134, 19135, and 19140 have had the six lowest percentages of 9th grade students enrolled at Carver, Central, Masterman and Palumbo from 2017–2018 to 2020-21. *Id.*

Appx21

c. **Even If the Changes to the 2021–2022 Admissions Process for Criteria-Based Schools Were Subject to Strict Scrutiny, Plaintiffs Have Failed to Show a Reasonable Probability of Success on the Merits as They Have Failed to Show Any Racially Discriminatory Impact.**

Even if Plaintiffs had been able to establish that there is a reasonable probability that the changes to the admissions policy will be subject to strict scrutiny, Plaintiffs would still not be entitled to a preliminary injunction based on the current record because Plaintiffs have failed to show the changes to the admissions policy resulted in a racially discriminatory impact. The Third Circuit has made clear, that even if a law is enacted for a racially discriminatory purpose, if it is a facially neutral law and it is being applied in a race-neutral manner, it will only result in a constitutional violation, if it results in a racially discriminatory impact. *Lower Merion*, 665 F.3d at 549 (quoting *Palmer v. Thompson*, 403 U.S. 217, 224, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971)) ("no case in [the Supreme] Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it").

In the present case, where the parties stipulated to the fact that the "School District does not have complete data regarding the race of each student who accepted an offer to attend Palumbo, Carver, Masterman, or Central in the 2022–2023 school year" and that the School District will not have the "demographic information for the complete incoming class until after August 29, 2022," the Court is unable to conclude that Plaintiffs have a reasonable probability of success on the merits for purposes of granting a preliminary injunction.

**Appx22**

**B. Because Plaintiffs Have Failed to Show a Reasonable Probability of Eventual Success on the Merits, Plaintiffs Cannot Succeed on Their Motion for a Preliminary Injunction.**

While the Third Circuit adopts a balancing approach to the grant of preliminary injunctions, the actual balancing of factors only comes into play once the moving party has successfully met the two critical gateway factors—that is (1) a reasonable probability of eventual success in the litigation, and (2) the possibility that the moving party will be irreparably injured in the event the preliminary injunction is not granted. *Reilly*, 858 F.3d at 176; *id*. at 179 ("[i]f these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief").

Here, while the Court does not rule out the possibility that further discovery will change the status quo, as of right now, there is not enough evidence on the record for the Court to reasonably conclude that the changes to the 2021–2022 admissions process for the School District's criteria-based schools were made for any racially discriminatory purpose. Additionally, the parties have stipulated to the fact that the evidence is not yet available as to whether the changes in admissions policies have resulted in a racially discriminatory impact. Therefore, Plaintiffs have not shown that there is a reasonable probability that the changes to admissions policy will be reviewed under strict scrutiny. Under rational basis review, as the record stands now, Plaintiffs chances of success on the merits are de minimis as Defendants have plainly set forth enough evidence to survive such a deferential standard of review.

Plaintiffs have, therefore, failed to establish a reasonable probability of eventual success on the merits—one of the threshold requirements necessary to secure a preliminary injunction.

Appx23

Accordingly, this Court need not consider the remaining factors. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989) ("a failure to show a likelihood of success *or* a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction.") (emphasis added); *see also Talbert v. Corr. Dental Assocs.*, No. CV 18-5112, 2019 WL 6460499, at *3 (E.D. Pa. Nov. 29, 2019) (citing *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989)) (citing *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir. 1987)) (providing that to succeed on a motion for a preliminary injunction a moving party "must demonstrate *both* a likelihood of success on the merits and the probability of irreparable harm if relief is not granted") (emphasis in original).

## V.    CONCLUSION

For the reasons provided above, this Court will DENY Plaintiffs' Motion for a Preliminary Injunction (ECF No. 32). An appropriate Order follows.

BY THE COURT:

/s/ *Chad F. Kenney*

**CHAD F. KENNEY, JUDGE**

**Appx24**

## CERTIFICATE OF SERVICE

I certify that on November 2, 2022, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Third Circuit and served through CM/ECF upon:

WILLIAM KENNEDY
Montgomery McCracken Walker & Rhoads LLP
1735 Market Street
Philadelphia, Pennsylvania 19103-7505
(215) 772-7291 (phone)
(215) 731-3689 (fax)
wkennedy@mmwr.com

*Counsel for Defendants-Appellees*

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiffs-Appellants*